73 N.J. Super. 274 (1962)
179 A.2d 743
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BERNARD WEISSMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1962.
Decided March 27, 1962.
*276 Before Judges PRICE, SULLIVAN and LEWIS.
*277 Mr. William A. Ancier argued the cause for appellant (Mr. Leon J. Lavigne, attorney; Mr. Ancier, of counsel).
Mr. Peter Murray, Assistant Prosecutor of Essex County, argued the cause for respondent (Mr. Brendan T. Byrne, Prosecutor of Essex County, attorney; Mr. Murray, of counsel)
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant Bernard Weissman was tried by a jury on a two-count indictment. The first count, which was dismissed by the court, related to the unlawful possession of marijuana. The second charged him with the unlawful sale of such a narcotic drug to one Dolores F. Green, contrary to the provisions of R.S. 24:18-4. Upon judgment of conviction on the latter count, defendant was fined $1,000 and sentenced to State Prison for a term of five to ten years. On appeal we are presented with a three-point contention, viz, that the trial court committed "plain error" (1) in permitting the case to go to the jury despite the State's failure to prove the corpus delicti, and (2) in failing to declare a mistrial after alleged prejudicial statements were voluntarily made by a witness for the prosecution, and that (3) it was reversible error to overrule defendant's objections to the admission of certain evidence.

I.
It was developed by the trial testimony that detectives Daniel J. Coleman, William L. Suckey, Jr., and Hugh F. McNulty, Jr., members of the Newark police force assigned to the narcotics squad, in response to "anonymous information" of illegal activities, investigated apartment #12 at 115 Waverly Avenue, Newark, New Jersey. At that time, May 10, 1960, Dolores Green and her brother were the *278 occupants of the apartment, and the detectives were admitted into their residence at approximately 10:30 A.M. A search of the premises revealed nine brown envelopes, containing "green vegetative matter which had the physical characteristics of marijuana," under the bed mattress used by Dolores Green, and a small white envelope containing a similar substance which was found in the brother's room under his mattress. Green and her brother were arrested and taken to police headquarters. It was subsequently established, by chemical analysis, that the contents of these envelopes were in fact a narcotic drug identified as marijuana.
Based upon a statement taken from Green, the detectives procured the issuance of a warrant for the arrest of defendant Bernard Weissman. Green testified that she first met defendant at a tavern known as the 279 Club on West Kinney Street, Newark; that about two months prior to May 10, 1960 (after she had seen Weissman "[a]pproximately about six times") defendant had asked her to sell marijuana for him; and that they made arrangements whereby each bag or envelope containing the narcotic was to be sold for $5, from which Weissman was to get $3 and the remaining $2 was to be kept by her. Over a period of "about three weeks" she sold for defendant "about 200" bags or envelopes of the narcotic drug. In the early hours of the morning of her arrest (May 10, 1960), Green received from Weissman eight packages or envelopes of marijuana, and at that time she paid $80 which she owed to him for narcotics previously delivered. She further testified that she never used marijuana and prior to that time (her experiences with Weissman) she had never sold it.
Defendant now urges on appeal, for the first time, that plain error was committed by the court when it allowed the jury to deliberate upon his guilt or innocence when the evidence indicated that Green received marijuana for the purpose of selling the same as his agent, and that the proofs did not establish a sale of narcotics by him to Green. *279 In sum, it is contended, and we quote verbatim from appellant's brief:
"We submit the State has failed completely to establish that a sale of any commodity whatsoever to Dolores Green occurred and, moreover, that no sale of marijuana was proved. On the contrary, the transcript of the testimony shows convincingly that, assuming arguendo she did receive the alleged marijuana from defendant, she received the same, not by way of purchase from him, but for sale as his agent."
The propriety of defendant's conviction hinges upon the word "sell" as used in the legislation and the indictment now under review. We are referred to the decision of our Supreme Court in Motor Cargo, Inc. v. Division of Tax Appeals, 10 N.J. 580, 585 (1952), holding that "a `sale' usually imports a transfer of property in the goods by the owner or by one authorized in his behalf to transfer such property," and to our Uniform Sale of Goods Law, R.S. 46:30-7, declaring that "a sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." Thus, it is argued, the State must prove beyond a reasonable doubt that defendant transferred or delivered the illicit merchandise, and the title thereto, to Dolores F. Green as the buyer or purchaser thereof for a price or consideration, and, failing such evidence of a sale, the corpus delicti or factum of the crime was not established. We find it unnecessary for this opinion to review the decisional law and the several authorities cited in appellant's brief respecting the basic elements of a crime and the phrase "corpus delicti."
The indictment charges that defendant "did unlawfully sell a narcotic drug, to wit: Marijuana, to one Dolores F. Green, contrary to the provisions of R.S. 24:18-4." The cited statute makes it unlawful to "manufacture, possess, have under his control, sell, prescribe, administer, dispense or compound any narcotic drug," except as otherwise authorized by law. This section 4 of our act is *280 identical with its counterpart in the Uniform Narcotic Drug Act. 9B U.L.A., sec. 2, p. 285. The word "sale" has been defined by our Legislature to include "barter, exchange or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant or employee." N.J.S.A. 24:18-2(n). The same definition is included in the uniform act, which adds, however, the word "gift" to the transactions therein enumerated. 9B U.L.A., sec. 1(10), p. 280.
The courts of this State have not heretofore been called upon to construe, in a reported decision, the legislative meaning of "sale" or "sell" as employed in our Narcotic Drug Law. We are not, however, without precedent. The State of Illinois has adopted the Uniform Narcotic Drug Act, and the Supreme Court of that state in People v. Shannon, 15 Ill.2d 494, 155 N.E.2d 578, 580 (1959), in construing their statute, said:
"We interpret the meaning of the word `sale,' as defined by the act, to be much broader in scope than that usually given to it in other branches of the law. Admittedly, the defendant took the role of at least an agent, and the act specifically declared an agent in a narcotics transaction to be a seller. We are of the opinion that the definition shows a legislative intent that the act of a person whether as agent, either for the seller or the purchaser, or as a go-between, in such a transaction constitutes a sale."
This case was cited approvingly by the same court in People v. Glass, 16 Ill.2d 595, 158 N.E.2d 639 (Sup. Ct. 1959), and the identical judicial concept was restated in People v. Aldridge, 19 Ill.2d 176, 166 N.E.2d 563, 565 (Sup. Ct. 1960), cert. denied 364 U.S. 873, 81 S.Ct. 117, 5 L.Ed.2d 95 (1960). The court in this last decision explicated its previous interpretation by saying:
"Under the broad reach of this definition it is not necessary to trace title to the drug with technical nicety in order to establish an unlawful sale. Nor does one who is proved to have participated in some capacity forbidden by the statute escape guilt because the proof does not fix with certainty the particular capacity in which he *281 acted. Proof that a person participated in a transaction as principal, agent, servant, or employee is sufficient."
While these opinions, by the highest tribunal of a sister state, are not binding upon this court, they are of signal import, and we are more or less imperatively obliged to recognize their value as a guiding precedent. A paramount objective of our uniform state laws is the standardization of particular subjects within the United States and, to that end, we should refer to and seriously consider the construction given to comparable statutes in other jurisdictions. See 2 Sutherland Statutory Construction (3d ed., Horack, 1943), sec. 5211, p. 557.
The narrow interpretation ascribed to the word "sale" by defendant delimits and circumscribes its application to the common usage of that expression in the law of commerce. Under the Uniform Sales Act a sale implies and involves the passing of title. Indeed, "title" is an implicit element under the Uniform Commercial Code now adopted in New Jersey (L. 1961, c. 120, effective January 1, 1963), wherein it is stated that a "`sale' consists in the passing of title from the seller to the buyer for a price." N.J.S. 12A:2-106. This is but a constricted construction of the word as employed in a specific area of the law. The broad aspect of the term "sale" signifies the transfer of property from one person to another for a consideration of value, without reference to the particular mode in which the consideration is payable. 46 Am. Jur., Sales, sec. 2, pp. 194, 195. It is "a transmutation of property from one man to another in consideration of some price or recompense in value, * * *." Ibid. See also 2 Blackstone's Commentaries, c. 30, p. 446. While "sale" has a precise legal import, it "is not a word of fixed and invariable meaning, but may be given a narrow or broad meaning, according to the context or the surrounding circumstances and the conduct of the parties." 77 C.J.S. Sales sec. 1, pp. 575-576. In the language of Justice Holmes: "A *282 word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918).
We are not concerned with semantics but, rather, with legislative intent. If the statutory language is susceptible of two constructions, it is our function to adopt an interpretation that will carry out, not defeat, the manifest objective sought by the legislation. 2 Sutherland, op. cit., sec. 4704, p. 338. "[W]ords used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms." Alexander v. N.J. Power & Light Co., 21 N.J. 373, 378 (1956). See also New Capitol Bar & Grill Corp. v. Div. of Employment Security, 25 N.J. 155, 160 (1957); Cammarata v. Essex County Park Comm., 26 N.J. 404, 411 (1958). It is clear that the legislative design in New Jersey is to eradicate the illegal traffic in narcotic drugs. State v. Reed, 34 N.J. 554, 564 (1961). That was the primary purpose for the adoption of our Narcotic Drug Law in 1933. Ibid. When our Supreme Court, in discussing R.S. 24:18-4 in Reed, said:
"The statute was passed as an all-out offensive to combat the drug evil by eliminating sources of supply. Every step in the scheme of illegal distribution was made a violation of section 4." (p. 564)
it emphatically evinced a judicial policy of interpretation and enforcement consistent with the Illinois decisions, supra. Cf. 279 Club, Inc. v. Municipal Board of A.B.C. of Newark, 73 N.J. Super. 15 (App. Div. 1962).
In the case sub judice evidence was adduced that defendant delivered and transferred marijuana to Green on several occasions, and that subsequent thereto money was paid by her to him for prior deliveries. Weissman was *283 the moving principal in these insidious transactions in which he made the delivery and for which he received compensation. Under the circumstances of such unlawful episodes, it is immaterial whether Green be characterized as a "buyer," a "purchaser," or an "agent"  she was a recipient of marijuana, and money therefor was passed by her to the party from whom she acquired the illegal drug. We hold, as did the Illinois Supreme Court, that the word "sale" as defined in the Uniform Narcotic Drug Law is broader in scope than the definition usually given to it in other branches of the law, and that the passing of illicit merchandise and money, between the defendant and Green, constituted a sale as comprehended by and within the prohibitions of our narcotic drug laws.

II.
Detective Suckey testified on behalf of the State and, under direct examination, stated that defendant when arrested by the police was carrying a "fully loaded automatic," and during cross-examination he made the comment that defendant "had fathered a child" by a girl "he was staying with." At the time these statements were uttered defense counsel did not object, nor was the court requested to instruct the jury to disregard them. Any adverse or prejudicial effect of these remarks was effectively dispelled by subsequent testimony. On direct examination defendant denied that he had a baby by Mary Brevard, and she testified that Weissman was not the father of her child. Furthermore, defendant explained that he had just brought the "gun" back from a repair shop, and that the purpose of having it was for "protection in the tavern." We are not convinced that these voluntary, irresponsive statements by Detective Suckey, under the circumstances, had the capacity "to bring about an unjust result" within the plain error rule enunciated in State v. Corby, 28 N.J. 106, 108 (1958). Not every impropriety noted in a transcript will *284 justify an appellate court's disturbing a jury verdict. See State v. Orecchio, 16 N.J. 125, 129 (1954); State v. Sachs, 69 N.J. Super. 566, 577 (App. Div. 1961).

III.
Lastly, the defendant maintains that "[n]owhere is there proof that the substance in possession of Dolores Green was marijuana," the particular narcotic specified eo nomine in the indictment. There is abundant evidence to refute this argument. The envelopes, containing the alleged narcotic confiscated by the police officers, were each initialed by Green, taken by Detective Coleman and kept in a drawer at police headquarters under lock and key until May 18, 1960, when he in the presence of McNulty turned them over to the department chemist, William R. Seligman, who made a note thereof in his ledger. The contents of these envelopes, nine brown and one white, were subjected to a microscopic examination and the active ingredient chemically extracted therefrom "by means of the Duquenois reaction." Seligman's testimony was that these "specimens" had a total weight of "31.8065 grams"  a little more than an ounce  and that "[e]ach of the ten envelopes contained marijuana," a narcotic drug according to chemical definition. He further testified that after making the analysis he placed the marijuana in his own envelopes, marked them as originally identified, and that he personally sealed them with scotch tape and placed them in his safe where they remained until the time of the trial. Lieutenant Philip Wittcoff was a witness to the transfer and he gave corroborative testimony. In response to the prosecutor's question, "Do these envelopes contain the contents that you yourself personally analyzed and previously testified as having been received from Officer Coleman and Officer McNulty," he unequivocally answered, "That's correct."
The chain of possession and identification of the illegal marijuana was adequately linked from the time of its *285 seizure in Green's apartment on May 10, 1960 to its admission into evidence at the trial. State v. Campisi, 23 N.J. 513 (1957) is not analogous. In that case there was no proof that the drug was "heroin," the narcotic specified in the indictment. Likewise, the remaining authorities cited by defendant are factually distinguishable.
Affirmed for reasons stated.