96 N.J. Super. 314 (1967)
232 A.2d 879
FANNIE LOU JACKSON AND CULBERT JACKSON, HER HUSBAND, PLAINTIFFS,
v.
MUHLENBERG HOSPITAL, A CORPORATION, EASTERN BLOOD BANK, A CORPORATION, AND ESSEX COUNTY BLOOD BANK, A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 13, 1967.
*319 Mr. Irwin B. Seligsohn, for plaintiffs (Messrs. Balk, Jacobs, Goldberger & Mandell, attorneys).
Mr. Thomas T. Chappell, for defendant Muhlenberg Hospital (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. Eugene M. Purcell, for defendant Eastern Blood Bank (Messrs. Stevens & Mathias, attorneys).
Mr. John B. Stone, Jr., for defendant Essex County Blood Bank (Messrs. Ryan, Saros, Davis & Stone, attorneys).
FULOP, J.S.C.
These are motions for summary judgment in favor of defendants Eastern Blood Bank (hereinafter referred to as Blood Bank) and Muhlenberg Hospital (hereinafter referred to as hospital). The legal issue is the liability of a commercial blood bank and a hospital for the contracting of hepatitis by a patient as a result of blood transfusions.
*320 Plaintiff Fannie Lou Jackson was hospitalized at Muhlenberg Hospital from March 7 to March 20, 1964, and was operated upon there. During her hospitalization she received five blood transfusions. The blood for four of the transfusions was purchased by the hospital from Eastern Blood Bank for $18 per container. The hospital charged the patient $25 for each container of blood and $20 for the transfusion thereof. The fifth transfusion was of blood received from another defendant, Essex County Blood Bank, a voluntary, nonprofit organization, which has brought no motion.
Mrs. Jackson contracted hepatitis attributed to the transfusions. She and her husband Culbert Jackson both seek damages from all three defendants.
For the purpose of these motions it is assumed by all of the parties that the female plaintiff was infected with homologous serum hepatitis by the transfusion into her body of the blood furnished by Blood Bank to the hospital and furnished by the latter to her.
Two of the bottles of blood furnished by Blood Bank were obtained by it from known individuals and were processed by it. Two other pints were obtained from Interstate Blood Bank of Memphis, Tennessee, not a party to this action.
It appears by affidavit on these motions, and it is not disputed, that:
1. At the time that the blood was furnished by Blood Bank to the hospital there was and there now is no test known to science for determining whether human blood contains the virus of homologous serum hepatitis. See State v. Weiner, 41 N.J. 21 (1963).
2. Every bottle of blood furnished by Blood Bank to the hospital bore in two places in two sizes of type the following disclaimer:
"Despite the utmost care in the selection of donors, human blood may contain the virus of Homologous Serum Hepatitis. Therefore Eastern Blood Bank does not warrant against its presence in this blood."
*321 Plaintiffs allege negligence on the part of all defendants. They also base their claims upon an implied warranty of fitness of the blood for the use intended, or strict liability for furnishing dangerously defective goods.
Plaintiffs contend that the blood was a sale of goods by Blood Bank to the hospital and by the hospital to them. Defendants deny there were any sales and contend that the furnishing of blood was a service not bearing the warranties implied on a sale. Defendants rely on Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954), a 4-3 decision of the New York Court of Appeals denying recovery against a hospital for hepatitis contracted from transfusion of blood. The majority of the court held that the furnishing of the blood was not a sale but a part of the service rendered by the hospital, and that no warranty was implied. There was a vigorous and persuasive dissent by Judge Froessel, concurred in by Judges Conway and Dye.
Liability for harm resulting from the transferring of blood bearing the virus of hepatitis has been denied in many jurisdictions. In some of the cases defendants enjoyed charitable immunity from tort liability. However, the cases have generally accepted the view of the majority in Perlmutter that no sale was involved. See Sloneker v. St. Joseph's Hospital, 233 F. Supp. 105 (D. Colo. 1964); Gile v. Kennewick Public Hospital Dist., 48 Wash.2d 774, 296 P.2d 662, 59 A.L.R.2d 761 (Sup. Ct. 1956); Koenig v. Milwaukee Blood Center, Inc., 23 Wis.2d 324, 127 N.W.2d 50 (Sup. Ct. 1964); Dibblee v. Dr. W.H. Groves Latter-Day Saints Hospital, 12 Utah 2d 241, 364 P 2d 1085 (Sup. Ct. 1961); Goelz v. J.K. and Susie L. Wadley Research Institute, 350 S.W.2d 573 (Tex. Civ. App. 1961); Whitehurst v. American National Red Cross, 1 Ariz. App. 326, 402 P.2d 584 (Ct. App. 1965); Balkowitsch v. Minn. War Memorial Blood Bank, Inc., 270 Minn. 151, 132 N.W.2d 805 (Sup. Ct. 1965).
Perlmutter has been questioned and criticized in 103 U.Pa.L. Rev. 833 (1954-5); 18 Okla. L. Rev. 104 (1965); *322 37 Notre Dame L. Rev. 565 (1962); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Col. L. Rev. 653 (1957); 69 Harv. L. Rev. 391 (1955); 29 St. John's L. Rev. 305 (1955); 42 Minn. L. Rev. 640 (1958); Gottsdanker v. Cutter Laboratories, 182 Cal. App.2d 602, 6 Cal. Rptr. 320, 79 A.L.R.2d 290 (App. Ct. 1960).
Florida has rejected Perlmutter as applied to a blood bank. Russell v. Community Blood Bank, Inc., 185 So.2d 749 (D. Ct. App. 1966), affirmed in this respect sub nom. Community Blood Bank, Inc. v. Russell, 196 So.2d 115 (Fla. Sup. Ct. 1967); Hoder v. Sayet, 196 So.2d 205 (Fla. D. Ct. App. 1967).
In Magrine v. Krasnica, 94 N.J. Super. 228 (Cty. Ct. 1967), Judge Lynch said:
"It is doubtful that New Jersey would follow Perlmutter, at least insofar as it holds that a `sale' was not involved or that such description of the transaction is necessary to establish strict liability. See cases cited, supra. Perhaps a more valid ground for the decision is the majority's secondary consideration that, because it is impossible to avoid some portion of hepatitis strain in blood used for transfusion, strict liability should not be applied." (at p. 237)
Magrine did not involve a blood transfusion and this statement was dictum. There appears to be no other case in New Jersey dealing with the subject.
In the Uniform Commercial Code as adopted in New Jersey effective January 1, 1963, at N.J.S. 12A:2-106, a sale is defined as follows: "A `sale' consists in the passing of title from the seller to the buyer for a price." The reference is to the sale of goods defined in N.J.S. 12A:2-105(1) as follows:
"(1) `Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Chapter 8) and things in action. `Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (12A:2-107)."
*323 In State v. Weissman, 73 N.J. Super. 274 (App. Div. 1962), the court dealt with the contention that the proof failed to establish a sale of narcotics by defendant within the meaning of the criminal statute forbidding such sales, R.S. 24:18-4. The evidence showed that defendant delivered marijuana to another under an arrangement whereby the latter would pay defendant for the goods when she sold them, and she did pay him after selling to others. The court held that this constituted a sale by defendant. In the course of the opinion Judge Lewis said:
"Under the Uniform Sales Act a sale implies and involves the passing of title. Indeed, `title' is an implicit element under the Uniform Commercial Code now adopted in New Jersey (L. 1961, c. 120, effective January 1, 1963), wherein it is stated that a `"sale" consists in the passing of title from the seller to the buyer for a price.' N.J.S. 12A:2-106. This is but a constricted construction of the word as employed in a specific area of the law. The broad aspect of the term `sale' signifies the transfer of property from one person to another for a consideration of value, without reference to the particular mode in which the consideration is payable. 46 Am. Jur., Sales, sec. 2, pp. 194, 195. It is `a transmutation of property from one man to another in consideration of some price or recompense in value, * * *.' Ibid. See also 2 Blackstone's Commentaries, c. 30, p. 446."
See also Motor Cargo, Inc. v. Division of Tax Appeals, 10 N.J. 580, 585 (1952).
The Uniform Commercial Code in N.J.S. 12A: 2-314(1) has put to rest the widely criticized holding of Nisky v. Childs Co., 103 N.J.L. 464, 50 A.L.R. 227 (E. & A. 1927), that the serving of food or drink in a restaurant amounts to a "service" and not a "sale" and bears no warranty of wholesomeness. See also Sofman v. Denham Food Service, Inc. 37 N.J. 304 (1962), especially the concurring opinion of Justice Schettino.
The rule that food served in a restaurant was not impliedly warranted to be fit for human consumption although food sold in a store was so warranted, had no support in modern concepts of justice. It was an anachronism. It is unthinkable that such a legalism should be revived to *324 avoid holding hospitals and blood banks liable. If these valuable organizations are to be exempted from liability, the immunity should be based upon the true policy consideration and not upon an irrelevant circumstance. See Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29 (1958); N.J.S. 2A: 53A-7 to 10, inclusive.
The transfer of human blood for a consideration is a sale. So is its transfusion into the body of a patient when a charge is made for the blood.
However, the nature of the transaction in which the product is transferred for a consideration is not determinative of the liability of defendants. It makes no difference whether the transaction was a sale or a service if the basic policy considerations which lead to strict liability are applicable. Cintrone v. Hertz Truck Leasing & R. Service, 45 N.J. 434 (1965); Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965).
Strict liability in tort for harm caused by defective merchandise sold or supplied for a consideration is the same cause of action as that asserted under the heading of warranty. The governing principles are identic. These are two labels for the same legal right and remedy. In Santor v. A. & M. Karagheusian, Inc., 44 N.J. 52 (1965), Justice Francis said:
"It must be said that in the present-day marketing milieu, treatment of the manufacturer's liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device or formalism to accomplish the purpose. It has been suggested, however, that conceptually such a doctrine is somewhat illusory because traditionally warranty has had its source in contract. Prosser, supra (69 Yale L.J., at pp. 1127-1134). Ordinarily there is no contract in a real sense between a manufacturer and an expected ultimate consumer of his product. The fact is that as a matter of public policy the law has imposed on manufacturers a duty to such persons irrespective of contract or a privity relationship between them. Such concept expressed in terms of breach of implied warranty of fitness or merchantability bespeaks a sui generis cause of action. Its character is hybrid, having its commencement in contract and its termination in tort. * * *
In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can *325 stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort * * *. It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. As the Supreme Court of California said, such representation must be regarded as implicit in their presence on the market. Greenman v. Yuba Power Products, Inc., supra (27 Cal. Rptr., at p. 701, 377 P.2d, at p. 901). The obligation of the manufacturer thus becomes what in justice it ought to be  an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. Cf. id. (27 Cal. Rptr., at p. 701, 377 P.2d, at p. 901). `Sales warranties,' said the court, `serve this purpose fitfully at best.' Prosser, Law of Torts, supra, at p. 674.
This strict liability in tort is not conditioned upon advertising to promote sales. It arises from mere presence of the product on the market.

* * * * * * * *
As we have indicated, the strict liability in tort formulations of the nature of the manufacturer's burden to expected consumers of his product represents a sound solution to an evergrowing problem, and we accept it as applicable in this jurisdiction." (at pp. 64-65 and 66)
In Restatement, Torts 2d, § 402 (A), comment (m), pp. 355-356 (1965), it is said:
m. "`Warranty.' The liability stated in this Section does not rest upon negligence. It is strict liability, similar in its nature to that covered by Chapters 20 and 21. The basis of liability is purely one of tort.
A number of courts, seeking a theoretical basis for the liability, have resorted to a `warranty,' either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of `warranty' to the user or consumer. But if this is done, it should be recognized and understood that the `warranty' is *326 a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.
The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill, or judgment of the seller who is to be held liable, nor any representation or undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to `buyer' and `seller' in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, `warranty' must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort."
Strict liability for harm caused by defective products is defined in the black letter of the Restatement, Torts 2d, pp. 347-348 as follows:

"§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and,
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
The cause of action is based upon proof that the product, when uttered by one engaged in the business of putting *327 such products into the stream of commerce, was "in a defective condition unreasonably dangerous to the ultimate user or consumer." It follows that if blood for transfusion which contains the hepatitis virus is not defective or is not unreasonably dangerous to the user it does not give rise to strict liability.
The rule is based on policy. The means available for avoiding the risk of harm and the extent of the risk must be weighed against the utility of the product. In the Restatement, Torts 2d, § 402 (A), comment (k), pp. 353-354, it is said:
"Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."
In Fischer v. Wilmington General Hospital, 1 Storey 554, 149 A.2d 749 (Del. Super. Ct. 1959), the court held that since the incidence of transmission of hepatitis by blood transfusion is .45% to 1%, and the fatality rate from *328 hepatitis is less than .5%, while death from shock resulting from hemorrhaging is very likely if blood is not furnished, a physician violated no duty in ordering a transfusion and the hospital violated no duty in giving the transfusion, although knowing the risk of hepatitis, without notifying the patient or her husband of the risk, "since the psychological and psychosomatic effect of the alarm which would be produced by such advice would run counter to the beneficial effect sought to be produced by the transfusion itself * * * [T]he risk of transferring the hepatitis virus is almost an insignificant risk in comparison of the risk of shock if transfusion is needed and not given."
In Community Blood Bank, Inc. v. Russell, supra, Justice Roberts in a separate opinion maintained that blood containing the hepatitis virus is a defective and unreasonably dangerous product and not within the class of unavoidably unsafe but highly useful products referred to in the above-quoted comment (k). of § 402(A) of the Restatement. He took the position that the financial burden of the risk should be placed on the blood bank and thus distributed among all of the users rather than borne by the injured person alone. But no other justice of the Florida Supreme Court concurred in this view. No case in any jurisdiction has been cited or found imposing strict liability for hepatitis upon a blood bank or hospital or physician giving or ordering a transfusion.
Although it is a purpose of imposing strict liability "to insure that the cost of injuries * * * resulting from defective products is borne by the makers of the products * * * rather than by the injured * * *," that is not the only basis for imposing such liability. Other reasons are an implied representation by the manufacturer or seller that the products are suitable and safe for the intended use, and "because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred * * *," Cintrone v. Hertz Truck Leasing & R. Service, supra.
*329 One underlying assumption in most if not all strict products liability cases is that the producer or an employee must have made a mistake in either the design, production or inspection of the product, or it would not have been defective and dangerous. In effect the courts have taken judicial notice of this and have relieved the injured party of the impossible burden of proving where the mistake occurred. Certainly a painstaking effort to avoid a defect does not excuse and should not excuse the error or oversight which has actually occurred. See Simon v. Graham Bakery, 17 N.J. 525 (1955). Where, as here, the harmful agent may be present without any error or oversight, the conclusive presumption of fault on the part of the producer is inapplicable. The producer is in no position to know or control the condition and there is no implied representation that the blood is free of the virus.
This, then, is a highly useful and desirable product attended with a known but reasonable risk. The marketing and use are justified. The blood is not defective or unreasonably dangerous. If the blood was properly collected, preserved and marketed and proper warning given, the seller "is not to be held to strict liability for unfortunate consequences attending [its] use." Restatement, Torts 2d, § 402 (A), comment (k).
Plaintiffs refer to implied warranty as a basis for their claim that defendants are strictly liable. There was an express disclaimer of warranty with respect to the presence of the hepatitis virus in the blood sold. Under the Uniform Commercial Code such a disclaimer is contractually valid if reasonable, N.J.S. 12A:2-316. In view of the undisputed fact that the presence of the virus cannot be detected and prevented, the disclaimer is clearly reasonable.
The label does, however, represent that Blood Bank employed "the utmost care in the selection of donors." An affirmation of fact which relates to the goods and becomes part of the basis for the purchase thereof creates an express warranty "that the goods shall conform to the affirmation." *330 It is not necessary that formal language of warranty be used. N.J.S. 12A:2-313(1)(a) and (2).
It will require a plenary trial to determine whether or not there has been a breach of warranty that utmost care was used in the selection of donors.
The fact that the patient and her husband probably never saw the label on the container of blood has not been overlooked. They are nevertheless entitled to the benefit of the express warranty. See N.J.S. 12A:2-318. The disclaimer is not the basis for denying strict liability. It is one element in determining the application of the law.
Blood is not supplied to a lay patient for infusion into himself. It is not available except on order of a physician, who presumably knows the risk and determines that the need outweighs the risk. He may properly be considered the patient's agent. As to the use of a product involving an unavoidable risk, the patient does not rely upon any representation or warranty of the producer of the blood or the hospital which supplies it, but upon the advice of the physician. The doctor's intervention and knowledge may be said to break the chain of proximate causation between the non-negligent acts of the blood bank and hospital and the harm to the patient. See Restatement, Torts 2d, § 452 (2) and comment (f), p. 490; Courtois v. General Motors Corp., 37 N.J. 525 (1962); Jakubowski v. Minn. M & M., 42 N.J. 177 (1964); Prosser, Torts (2d ed. 1955), chapters 8 and 9. See also, on assumption of risk as contributory negligence barring recovery, Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44 (1959); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434 (1965); Maiorino v. Weco Products Co., 45 N.J. 570 (1965); Restatement, Torts 2d, § 402(A), comment (n); Prosser, Torts, (2d ed. 1955), pp. 504 and 512.
Plaintiffs also allege that Blood Bank and the hospital were negligent in the collection and handling of the blood. If that is established and the negligence caused or contributed to cause the presence of the hepatitis virus, the *331 negligent defendant or defendants may be liable to plaintiff. This is so even though the virus might have been present without negligence. The jury may find the increased danger resulting from negligence to have been the proximate cause or a proximate cause of the harm. See Martin v. Bengue, Inc., 25 N.J. 359 (1957) (at headnote 8).
The allegations of negligence appear to be based upon the proposition that the mere presence of the hepatitis virus in the blood supplied bespeaks negligence. Plaintiffs argue for the application of the maxim, res ipsa loquitur.
Res ipsa loquitur means "The thing speaks for itself." The phrase describes a "Rebuttable presumption that defendant was negligent which arises upon proof that instrumentality causing injury was in defendant's exclusive control, and that the accident was one which ordinarily does not happen in absence of negligence." Black's Law Dictionary (4th ed. 1951); Kahalili v. Rosecliff Realty, Inc., 26 N.J. 595, 66 A.L.R.2d 680 (1958); Bornstein v. Metropolitan Bottling Co., 26 N.J. 263 (1958). In Kahalili the Supreme Court said that the inference arises when "the occurrence itself ordinarily bespeaks negligence."
"The rule has its foundation in probability and the procedural policy of placing the onus of producing evidence upon the party who is possessed of superior knowledge or opportunity for explanation of the causative circumstances. The presumption arises where the circumstances furnish reasonable grounds for the inference that if due care had been practiced by the person having control of the instrumentality causing the injury, the mishap would not have occurred. If the circumstances are such as will, unexplained, sustain the inference of negligence as reasonably probable, a prima facie case is made, and the issue goes to the jury. * * * Under the maxim negligence may be a permissible inference so as to take the case to the jury, but it is not a necessary one.

* * * * * * * *
`Reasonable probability' is the standard of persuasion, that is to say, evidence in quality sufficient to generate belief that the offered hypothesis is in all human likelihood the fact."
The maxim does not ordinarily apply to permit a jury to conclude that a defendant was at fault in a matter *332 in which only experts have sufficient knowledge to judge the conduct. It is a maxim of common sense, based on common knowledge. It applies only when a judge and jury of nonexperts can apply general experience in the ordinary affairs of life.
In Toy v. Rickert, 53 N.J. Super. 27 (App. Div. 1958) Judge (now Justice) Haneman held that the maxim may be applied in a medical malpractice action. However, the court held:
"For us to conclude that the occurrence, in a medical malpractice action, bespeaks negligence, we must first determine that the common knowledge or experience of ordinary laymen is such that they can infer that the harm would not have eventuated but for the negligence of defendant."
In Prosser, Torts (2d ed. 1955), § 42, p. 210, it is said:
"Since a physician or surgeon normally undertakes only to exercise the skill and care common to the profession, there usually is not enough in a mistaken diagnosis alone, or the unfortunate choice of the wrong method of treatment, or the kind of accident which happens in spite of all reasonable precautions, to show the necessary lack of skill or care. What this means is that ordinarily laymen are not qualified to say that a good doctor would not go wrong, and that expert testimony is indispensable before any negligence can be found.

* * * * * * * *
There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care."
In Sanzari v. Rosenfeld, 34 N.J. 128 (1961) Justice Proctor said:
"The doctrine of `common knowledge' is related to res ipsa loquitur, but there is a distinction between the two. In res ipsa cases, plaintiff need only prove his injury, and need not prove a standard of care or a specific act or omission. Ordinarily, the common knowledge doctrine is applied in a malpractice case after the plaintiff proves his injury and a causally related act or omission by the defendant. The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto."
*333 Since it is here assumed that the female plaintiff's hepatitis resulted from the transfusion of blood supplied by defendants, it is the "common knowledge" doctrine that plaintiff seeks to apply.
It cannot be said to be negligence as a matter of common knowledge to supply or use blood in a transfusion which may contain the virus of this ailment. It follows that unless plaintiffs establish some act or omission constituting negligence by evidence beyond the facts here assumed, the case may not go to the jury. However, it cannot be assumed on the present record that no such evidence can or will be presented. The case must therefore go to trial on the issue of negligence.
In view of the express warranty, defendant Blood Bank was required to use "utmost care" in the selection of donors. This may mean no more than care commensurate with the risk which both defendants were required to exercise in all procedures in which the hepatitis virus might have been introduced into the blood or permitted to multiply.

CONCLUSIONS
1. The supplying of blood by Blood Bank to the hospital constituted a sale.
2. The supplying of blood by the hospital to the plaintiff wife constituted a sale.
3. The unavoidable presence of hepatitis virus in the blood furnished does not give rise to strict liability for the resultant harm.
4. Blood Bank expressly warranted that it used the "utmost care" in the selection of donors. If breach of this warranty is proved, plaintiffs may recover for the resultant harm.
5. Blood Bank and the hospital owed plaintiffs the duty of exercising reasonable care, i.e., care commensurate with the risk, to avoid using blood containing the virus. Plaintiffs may recover for negligence which caused or contributed *334 to causing the infection of plaintiff wife with the disease.
6. As to conclusions 4 and 5, the evidence presented on the motion does not "show palpably that there is no genuine issue" of fact within the meaning of R.R. 4:58-3. These present jury questions.
Summary judgments will be entered in favor of the two defendants on the claims of plaintiffs based on strict liability and implied warranty of merchantability. The motions are denied as to the claims based on the express warranty above mentioned and upon negligence. A new pretrial order should be prepared restating the issues in accordance with this opinion.
As to the claims above determined, I find that there is no just reason for delay and final judgments should be entered in accordance with R.R. 4:55-2.