109 N.J. Super. 217 (1970)
262 A.2d 902
MARIE C. BAPTISTA, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF LEOPOLDO A. BAPTISTA, DECEASED, PLAINTIFF-APPELLANT,
v.
SAINT BARNABAS MEDICAL CENTER, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1969.
Supplemental Briefs Filed December 3, 1969.
Decided March 13, 1970.
*218 Before Judges CONFORD, COLLESTER and KOLOVSKY.
Mr. Gerald W. Conway argued the cause for appellant (Messrs. Schreiber and Lancaster, attorneys).
Mr. Wilbur A. Stevens argued the cause for respondent (Messrs. Stevens and Mathias, attorneys).
The opinion of the court was delivered by KOLOVSKY, J.A.D.
During a period beginning some six months prior to May 1963 Leopoldo A. Baptista had been treated by Dr. Zins for hypertension. During the night of May 4, 1963 he became seriously ill and when Mrs. Baptista reported his symptons to Dr. Zins the next day, the doctor suggested immediate hospitalization. Leopoldo entered defendant hospital on Sunday, May 5, 1963.
Tests revealed a serious malfunctioning of Leopoldo's kidneys so that body poisons were being built up rather than *219 eliminated. Dr. Zins decided that use of an artifical kidney would help carry his patient along, with the hope that in the meantime the patient's kidney condition would heal itself. He finally ascertained that there was an artificial kidney available for use at Pollak Hospital in Jersey City. Leopoldo was transferred to the latter hospital on May 10.
In the meantime, on May 9, pursuant to Dr. Zins' directions, defendant hospital had given Leopoldo a blood transfusion. Plaintiff contends that "incompatible" blood was used in the transfusion and that as a result Leopoldo's condition continued to grow worse, ending with his death on May 18, 1963 at Pollak Hospital. Plaintiff offers no criticism of the treatment, including four blood transfusions, which Leopoldo received while at Pollak.
In this action by plaintiff as administratrix ad pros. for damages under the Death Act, N.J.S.A. 2A:31-1 et seq., and as general administratrix to recover damages for Leopoldo's injuries, pain and suffering, plaintiff charged defendant Saint Barnabas Medical Center with (1) negligence and (2) breach of warranty.
At the close of all the evidence defendant moved for judgment in its favor. While the trial court denied the motion for judgment, it ruled that it would submit the case to the jury only with respect to the allegations of negligence. The verdict returned by the jury was, "We find the defendant not negligent." A subsequent motion by plaintiff for a new trial was denied. Plaintiff appeals.
Plaintiff's principal contention is that the court erred in refusing to submit the case to the jury on the pleaded theory of breach of warranty, and that "the doctrine of strict liability in tort should apply to the furnishing of blood by a hospital to a patient for transfusion purposes." Proper evaluation of these contentions requires a review of the proofs in this case with respect to the alleged incompatibility of the transfused blood.
To support her claim that a transfusion of incompatible blood was a contributing cause of Leopoldo's death, plaintiff *220 relied on the opinion testimony of a Dr. Graubard, whom she called as an expert witness, and the statement to that effect in the death certificate signed by a Dr. Speckhart, then a resident physician at Pollak Hospital. Dr. Speckhart was on the service of Dr. Lasker, an associate professor of medicine of the New Jersey College of Medicine and the staff physician at Pollak Hospital who was in charge of Leopoldo's case.
The pertinent portion of the death certificate (with the misspellings therein corrected) reads as follows:
17. CAUSE OF DEATH
 Interval between
 Onset and Death
 Part I. Death was caused by:
 Immediate Cause (a) Acute Tubular Necrosis
 Conditions, Due to (b) Chronic Glomerulonephritis
 if any, 1 yr. 3 mos.
 which gave Due to (c) Arteriolar Nephrosclerosis
 rise to above
 cause (a),
 stating the
 exciting cause
 last.
 Part II. Other significant Conditions Contributing to Death
 But Not Related to the Terminal Disease Condition
 Given in Part I (a)
 Transfusion of Incompatible Blood.
Dr. Graubard defined acute tubular necrosis as "the death of certain cells within the kidney so that there is no absorption of the waste products; they are allowed to accumulate in the blood." Nephritis is an inflammation of the kidney. Glomerulonephritis is a variety of nephritis characterized by inflammation of the capillary loops in the blood vessels of the kidney, Dorland's Medical Dictionary, 619 (24 ed. 1965), arteriolar nephrosclerosis is a form of nephritis characterized by a thickening of parts of the kidney. Ibid., at 990. According to Dr. Lasker, the last mentioned condition is "the type of kidney lesion which we see in patients with severe hypertension."
*221 At the time of the trial Dr. Speckhart was in the Congo. However, Dr. Lasker testified that what was set forth by resident physician Dr. Speckhart in the death certificate represented his  Dr. Lasker's  opinion at the time, an opinion which he had since revised following his examination of the records of defendant hospital which indicate that "The blood was properly cross-matched prior to its administration." That being so, it was his opinion at the time of the trial that "it's unlikely that [Leopoldo's] demise was due to incompatible transfusion."
Dr. Zins and other physicians called as witnesses by defendant testified that there was no indication that the blood used was incompatible.
Dr. Graubard expressed a contrary opinion. In response to a hypothetical question embodying what was shown in the records of the two hospitals, his opinion was that "incompatible blood produced the tubular necrosis which led to the eventual death of Mr. Baptista." But he was unable to tell in what respect the blood was incompatible "other than the fact that it ultimately resulted in Mr. Baptista's death." He was certain, however, to quote from plaintiff's brief, that "there was no indication of serum hepatitis, syphilis or virus or infection in the blood used for transfusion."
While there may be some question as to the evidential value of Dr. Graubard's opinion in view of his inability to specify the nature of the alleged incompatibility, cf. Germann v. Matriss, 55 N.J. 193 (Jan. 19, 1970), we assume, for present purposes, that his opinion and that set forth in the death certificate would be sufficient to support a jury finding that the transfused blood was incompatible with that of decedent.
In view of plaintiff's concession that the blood used in the transfusion was wholesome and free from infection or other defect, the only explanations for the administration of the allegedly incompatible blood would be either (1) the failure of defendant to follow standard recognized procedures in receiving or storing the blood or in testing to insure that the blood of the donor and that of the patient were not incompatible, *222 or (2) the inadequacy of then existing recognized tests and procedures to disclose all possible kinds of incompatibility.
The first hypothesis appears to have been the gravamen of the contentions made by plaintiff in the pretrial order where her sole assertions were that:
The blood was furnished to plaintiff's decedent by St. Barnabas Medical Center, cross-matched and typed inaccurately producing incompatible blood from which plaintiff's decedent died. Plaintiff contends that the defendant St. Barnabas Medical Center impliedly and expressly warranted that the blood was fit and wholesome and that it was properly cross-matched and typed and compatible with plaintiff's decedent's blood. As a result of its breach of warranty and its negligence, plaintiff's decedent died. [Emphasis added]
The italicized language basically sounds in negligence. However, plaintiff offered no affirmative proof that in fact the blood was "cross-matched and typed inaccurately." No evidence was offered to contradict what appeared from the hospital records and from the testimony of the clinical pathologist who was the director of its laboratory that all standard procedures were followed in receiving and storing the blood; that the donor blood and that of the patient were subjected to all tests in use in 1963 to determine incompatibility (some other tests have been developed since), and that the tests showed that the two blood samples were compatible.
Dr. Graubard, plaintiff's expert witness, conceded that if the hospital had in fact followed the procedures and tests so testified to, then it had complied with established standards and could not be charged with malpractice. In this aspect the issue thus became one of the credibility of the hospital records and of the director of its laboratory  an issue which the jury resolved in defendant's favor by its verdict, "We find defendant not negligent."
The question of the scope of the liability of a hospital for the deleterious effects of a blood transfusion has heretofore arisen only in a case where the transfused blood contained *223 viral hepatitis. The Law Division held that transaction was a "sale" and that the supplying blood bank and hospital should be held liable for the harm caused by the defective product or blood they "sold." Jackson v. Muhlenberg Hospital, 96 N.J. Super. 314 (Law Div. 1967). But the Supreme Court reversed, 53 N.J. 138 (1969), saying:
[T]he issue of whether a commercial blood bank and a hospital may be held accountable on the basis of implied warranty or strict liability where their furnishing of blood containing viral hepatitis has resulted in consequential injury to the complaining party. * * * is a very important one involving highly significant policy considerations and obviously should not be decided on the wholly inadequate record before us. * * * cf. Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291, 296 (1952): "A maximum of caution is necessary in the type of litigation that we have here, where a ruling is sought that would reach far beyond the particular case."
In the factual situation presented here, the plaintiffs' cause of action would traditionally be grounded on principles of negligence and accordingly their complaint contained appropriate allegations that the defendants had failed to exercise due care with consequential injury to the plaintiffs. [at 141-142]
The court then reinstated negligence counts which plaintiffs had abandoned and remanded the matter for trial, directing that:
At the trial, a complete record should be made, including not only detailed testimony as to the nature of the defendants' operations, but also expert testimony as to the availability of any tests to ascertain the presence of viral hepatitis in blood, the respective incidences of hepatitis in blood received from commercial blood banks and other sources, and such other available testimony and materials as may be relevant to any of the questions presented by the parties, including such economic and other factors as may bear on the question of whether the doctrine of implied warranty or strict liability should apply to deliveries and transfusions of blood. [at 142-143][*]
*224 Whatever may be the final policy decision to be reached in cases involving blood infected with viral hepatitis, we find no justification for extending the doctrine of strict liability to a case such as this where the blood is not infected or defective.
To accept plaintiff's contention would be to adopt a rule that a hospital is accountable on the basis of implied warranty or strict liability in tort for injuries resulting from a blood transfusion even though the article allegedly "sold" was wholesome and free from internal defect and even though the hospital followed standard recognized procedures in dealing with donor blood and in testing both the donor blood and the patient's blood for incompatibility.
To adopt such a rule would be to make a hospital an insurer of what are in essence medical services and opinions, the cross-matching and typing of blood. In our view, the same policy considerations which led the court in Newmark v. Gimbel's Incorporated, 54 N.J. 585, 596-597 (1969), to hold that the rules of strict liability in tort and implied warranty should not be imposed on dentists and doctors apply to the services rendered by defendant hospital in this case. The obligation of hospitals in cross-matching and typing blood in cases of blood transfusions should continue to be as it is now, grounded and expressed in a duty to exercise reasonable competence and care.
Plaintiff's only other contention is that the court's charge on the issue of proximate cause was erroneous. However, our reading of the court's charge as a whole satisfies us that although there was room for improvement in its explanation of "proximate cause," still the issue was adequately dealt with and the jury could not have been misled.
In any event, even if the charge be deemed erroneous, no prejudice appears since the jury's finding that defendant was not negligent  a finding which the evidence mandated if the jury believed the testimony of defendant's laboratory director and the hospital records  made it unnecessary for it to reach the issue of proximate cause.
The judgment is affirmed.
*225 CONFORD, P.J.A.D. (dissenting).
I conclude the trial court erred in not submitting plaintiff's case to the jury on the theory of breach of warranty in addition to the claim of negligence.
Firstly, there was clearly presented a jury issue on whether the blood transfused into the decedent was incompatible. The fact that Dr. Graubard, plaintiff's expert, could not say in what respect the blood was incompatible does not moderate the weight of his opinion. Indeed, it would be difficult, if not impossible, for any expert not a party to the laboratory work to say after the event in what respect the blood was incompatible since it could possibly have been the mismatching of blood types or of blood groups or the presence of other incompatible factors in the blood of donor or recipient. The administration of the incompatible blood could have resulted from error in typing blood, in labeling containers, in cross-matching before transfusing, or in giving the blood to the wrong patient. See Haut and Alter, "Blood Transfusions-Strict Liability?", 43 St. John's L. Rev. 557, 558 (1969); Thomas, "Blood Transfusion Liability," 10 Clev.-Mar. L. Rev. 469, 470-473 (1961); Zeitlin, "Blood Transfusion Hazards," 2 Medicine, Science & Law. 294, 295-299 (1961). See also Randall, "Medico-Legal Problems in Blood Transfusions," 20 S.C.L. Rev. 1, passim (1968).
Dr. Graubard's conclusions of incompatibility and causal contribution to death were arrived at by the same general reasoning process as Dr. Lasker's, when he came to a similar conclusion, reflected by the death certificate admitted in evidence, after the patient's death at the Pollak Hospital  i.e., inference from attendant circumstances. They considered the indicia from the hospital records of the nature of the patient's condition and symptoms before the transfusion, certain untoward symptomatic manifestations during the transfusion consistent with incompatible transfusion and a rapid downhill course of his kidney disease immediately after the operation resulting in renal shutdown followed by death nine days after the transfusion in question. This, too, was *226 suggestive of incompatible transfusion.[1] Dr. Lasker's initial conclusion to that effect was influenced also by a consultation with Dr. Zins, the treating physician, in which he was told that the patient got worse after the transfusion and had a reaction in the course of it. The Pollak hospital records contain a notation of "History obtained from Dr. Zins," part of which, written by Dr. Lasker, reads:
Given blood transfusion and developed acute renal failure with anuria and gross hematuria. Apparently dealing with case of arteriola nephrosclerosis or chronic GN with acute tubular necrosis superimposed by transfusion of incompatible blood.
Dr. Lasker testified that the type of kidney lesion which the patient had indicated a usual prognosis of six months to a year and that this applied specifically to decedent. Yet, as noted, the patient died within nine days of the transfusion, following what Dr. Lasker described as a "rapid downhill course" thereafter. At the trial, on the basis of a hypothetical question including the facts that the blood was typed as to classification and cross-matched without reaction, Dr. Lasker said it was "unlikely that his [decedent's] demise was due to incompatible transfusion." However, the hypothesized facts were not conclusively established by the evidence.
Dr. Bernhard, in charge of defendant's laboratory, testified as to the standard practices followed in selecting, typing and cross-matching blood before transfusion. He does not personally do this work. It is done by laboratory technicians. The hospital records designed to record the progress of this blood work were only partially filled out in the case of this patient. The technician who probably did this work was not a witness.
*227 I conclude on the whole case, as the majority assumes, that the jury could reasonably have found that defendant transfused incompatible blood into the decedent. The question then arises whether its liability therefor should be confined within the ambit of the law of negligence or broadened toward either or both of the cognate principles of implied warranty of fitness for intended purpose and strict tort liability. The closest judicial approach to the question in this State is the case of Jackson v. Muhlenberg Hospital, cited and discussed in the opinion of the majority. The question there related to liability of a hospital and a blood bank for damage from the administration of blood containing viral hepatitis. What is significant about the remand opinion of the Supreme Court is that that tribunal apparently presently entertains an open mind on whether liability in this area should be extended by application of the doctrines of implied warranty and strict tort liability, and is disposed to resolve the issue on broad policy considerations rather than by the sterile criterion as to whether the provision of the blood is a sale or a service. See the comment on Jackson in Haut and Alter, supra, 43 St. John's L. Rev., at 570-573.
The "service" concept was the basis for rejection of breach of warranty or strict liability in Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (Ct. App. 1954), and most cases throughout the country have followed it in both hepatitis and incompatibility cases. Annotation 59 A.L.R.2d 768 (1958). The Florida cases alone make the distinction that blood supplied by a blood bank is a sale (with liability for breach of warranty of quality), while that supplied by a hospital is a part of its service, immune from the broadened liability. Russell v. Community Blood Bank, 185 So.2d 749 (Fla. App. 1966), modified 196 So.2d 115 (Sup. Ct. 1967).
The validity of the general service-sale criterion for imposition of warranty-strict tort liability has been fully laid to rest in this State by the Supreme Court in Newmark v. Gimbel's Incorporated, 54 N.J. 585 (1969). In an opinion *228 holding a beauty parlor operator liable for breach of implied warranty of fitness of a hair wave solution the operator used in giving a customer a permanent wave, the court held that the transaction was a "hybrid partaking of incidents of a sale and a service. It is really partly the rendering of service, and partly the supplying of goods for a consideration." (At 593). Consequently, "an implied warranty of fitness" of the product used in giving the wave existed "with no less force than it would have in the case of a simple sale." Id. The court emphasized that the patron relied on the implicit assurance of the operator that the latter had the skill and knowledge to select proper materials and to use them with the requisite expertise so as not to injure her. She was a "mere passive recipient" of the ministrations and products controlled and selected by the operator. (At 594).
This rationale is perfectly apposite here, but even more markedly. The case is not different, as the majority suggests, because the blood here was not inherently defective, i.e., if administered to an appropriate recipient. The implied warranty here breached is not that of quality or merchantability but of fitness for the recipient's particular purposes, known to the supplier, and involving reliance on the supplier's skill and judgment. N.J.S.A. 12A:2-315. If incompatible, the blood was just as inimical to this recipient as if it were polluted by the virus of a contagious disease.
Were the supplier not a hospital, I entertain little doubt that the principle of implied warranty-strict liability would apply here, having in mind the steady progression of the law of strict tort liability in this State toward broad public protection since Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960). See the appellate court opinion and that of Roberts, J., concurring in the Supreme Court, in Community Blood Bank, Inc. v. Russell, supra. The only real basis for dispute is whether the immunity from strict liability expressly staked out by dictum in Newmark v. Gimbel's Incorporated, supra, for the benefit of doctors and dentists (discussed hereinafter), should be extended to hospitals.
*229 An important consideration in determining whether to apply the principle of imposition of strict tort liability is whether the class of defendants affected has available, if resorted to, the means and techniques for preventing the injurious effect of the product supplied to the claimant. That was one of the factors which led the trial court in Jackson v. Muhlenberg Hospital, supra, to conclude against strict tort liability in respect of administration of a transfusion of blood containing viral hepatitis, 96 N.J. Super., at 329, the consensus hitherto being that detection thereof is scientifically impossible. In remanding in that case, the Supreme Court called for "expert testimony as to the availability of any tests to ascertain the presence of viral hepatitis in blood." 53 N.J., at 142.
There is no comparable difficulty in relation to incompatibility. There is virtual unanimity that efficient administration of standard techniques of typing, grouping and cross-matching of blood (even as of 1963) reduces the chances of transfusion of incompatible blood to the minimal. Haut and Alter, supra, 43 St. John's L. Rev., at 559. Vis-a-vis the patient, who is completely dependent upon the hospital personnel and has paid the institution for a compatible transfusion, it would seem consonant with elemental justice that the hospital assume liability for the damage caused by a mischance which it could in all probability have prevented.[2]
As noted above, there must be an appraisal of the effect upon the present issue of the deliberate declaration, albeit by dictum, of the Supreme Court in Newmark v. Gimbel's Incorporated, that the doctrine of strict liability will not be extended to doctors and dentists. 54 N.J., at 595-597. While *230 some of the considerations advanced therein might appear here also to support limitation of liability to exercise of reasonable care (rendition of sui generis services intimately related to the public health and welfare), others mentioned do not. The professional status of the physician and the essence of his function as the furnishing of opinions and services devoid of certainty or assurance of cure or relief is not comparable to the function of the hospital staff in providing and administering blood for a transfusion. In this regard the hospital is merely the independent instrumentality of the physician who has ordered the transfusion performed; a thoroughly careful administration of the standard procedure of transfusion is highly unlikely to eventuate in transfusing incompatible blood, and the actual procedure is routinely performed by laboratory technicians, as the testimony indicates was the case in the present instance, not by physicians. Moreover, the remand in Jackson, supra, seems inconsistent with any notion that the Supreme Court was then of the fixed view that hospitals should as a matter of public policy necessarily be free from strict tort liability in a blood transfusion case.
Giving consideration to all of the foregoing and to the injustice of leaving the victim of an incompatible transfusion remediless except for the uncertainties of a negligence action, I cast my vote for application of the rule of implied warranty-strict liability in this situation. Tort liability of hospitals is limited by statute to a maximum of $10,000. Adding the increase in premiums for insurance to cover strict liability for such exigencies as this to the overall expense of providing hospital service for the community does not seem to me to place such an undue burden on the institution  and through it on the community it serves  as to justify the alternative of leaving the innocent victim of such a misfortune to bear his burden alone if he cannot convince a jury of negligence.
I would reverse and order a new trial on the issue of implied warranty-strict liability.
NOTES
[*] The records of the trial court in Jackson v. Muhlenberg Hospital (Docket L 21730-64) show that no further proceedings were taken following the remand by the Supreme Court. The only instrument thereafter filed was a stipulation dated June 29, 1969, signed by all counsel, reciting that the matters in difference had been amicably adjusted by and between the parties and dismissing the action with prejudice but without costs.
[1] It may be significant, although of course not evidential in this case, that according to the literature, the most serious type of injury to a blood transfusion recipient in case of use of incompatible blood is damage to the kidney tissues, causing anuria  the arrest of urinary output  which results in death. Gordy-Gray, Attorney's Textbook of Medicine (1969 Supp), § 1.57, pp. 1-17; Note, "Liability for Blood Transfusion Injuries," 42 Minn. L. Rev. 640, 645 (1958). This was the ultimate development in the present case.
[2] It must be kept in mind that I am here discussing the considerations for imposition of a rule of law, and it is therefore irrelevant that in this particular case the jury found no negligence. Moreover, the verdict does not establish that in fact no mistake in the blood analysis and administration process occurred  merely that the jury was not satisfied that plaintiff had shown by a preponderance of the evidence that defendant failed to exercise due care in transfusing the decedent.