127 N.J. Super. 331 (1974)
317 A.2d 392
SARAH BRODY, EXECUTRIX OF THE ESTATE OF EUGENE BRODY, DECEASED, AND SARAH BRODY, INDIVIDUALLY, PLAINTIFF-RESPONDENT,
v.
OVERLOOK HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, AND ESSEX COUNTY BLOOD BANK, DEFENDANTS-APPELLANTS, AND BERNARD ERDMAN, HELEN BENJAMIN AND EASTERN BLOOD BANK, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS, AND WILLIAM U. CAVALLARO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1973.
Decided March 26, 1974.
*332 Before Judges LEONARD, ALLCORN and CRAHAY.
Mr. Bartholomew A. Longo argued the cause for appellant Essex County Blood Bank (Messrs. Ryan, Saros, Davis and Stone, attorneys).
Mr. William P. Ries argued the cause for appellant Overlook Hospital.
*333 Mr. Ira J. Zarin argued the cause for respondent Brody (Messrs. Zarin and Maran, attorneys).
Mr. Robert J. McCoid argued the cause for respondent Cavallaro (Messrs. Morgan, Melhuish, Monaghan, McCoid and Spielvogel, attorneys; Mr. Henry Spielvogel, of counsel).
An amicus curiae brief was filed on behalf of New Jersey Hospital Association by Messrs. McCarter & English, attorneys (Mr. Woodruff J. English and Mr. Eugene M. Haring, of counsel; Mr. Frederick B. Lehlbach, on the brief).
An amicus curiae brief was filed on behalf of New Jersey Blood Bank Association by Messrs. Shanley & Fisher, attorneys (Mr. John J. Francis, Jr., of counsel; Mr. Albert L. Strunk, III, on the brief).
The opinion of the court was delivered by LEONARD, P.J.A.D.
Defendants Overlook Hospital (Overlook) and Essex County Blood Bank (County Blood Bank), with leave first granted, appeal from a judgment as to liability only, entered upon a jury verdict against them and in favor of plaintiff.
On December 18, 1966 decedent Eugene Brody was admitted to Overlook for the treatment of a severely comminuted fracture of his right femur. On the same day defendant William V. Cavallaro, an orthopedic specialist, performed an open reduction. At the doctor's order two pints of blood were transfused during the operation and one pint post-operatively. Two of the pints of blood were obtained from the hospital's blood bank and one pint from the County Blood Bank. Brody was discharged on February 1, 1967.
On February 14, 1967 he was re-admitted to Overlook with a final diagnosis of "serum hepatitis secondary to blood transfusion in December, 1966 with shock and renal failure." *334 Three days later he was transferred to Mt. Sinai Hospital in New York for an exchange transfusion and expired there the next day.
On February 10, 1969 plaintiff filed her complaint as executrix of the estate of her deceased husband and in her own right against defendants Overlook, County Blood Bank, Dr. Cavallaro and others (not presently involved in this appeal), charging them with negligence and breach of warranty.
On the day fixed for trial the trial judge first rendered a "Decision" (reported at 121 N.J. Super. 299) which determined, among other things, that if the jury found that decedent died of viral hepatitis due to contaminated blood supplied by the hospital and County Blood Bank, the theory of strict liability would apply to these two defendants. Thereupon, the matter was tried with a jury on the issue of liability alone and was submitted upon the following special interrogatories and instructions:
1. Was serum hepatitis communicated to the decedent, Eugene Brody, by virtue of blood transfused into him at the Overlook Hospital in December of 1966?
2. If the answer to number 1 is "no" then you will go no further but will return a verdict of no liability.
3. If the answer to number 1 is "yes," then did this contaminated blood proximately cause the death of the decedent, Eugene Brody?
4. If the answers to 1 and 3 are "yes," then you will return a verdict that the defendants Overlook Hospital and Essex County Blood Bank are liable.
The jury unanimously answered 1 and 3 in the affirmative and accordingly rendered a verdict holding the hospital and County Blood Bank liable to plaintiff.
The primary question to be resolved is whether, under the circumstances existing herein, the trial judge properly applied the doctrine of strict liability to these two defendants.
Preliminarily, it is to be noted that in arriving at the answer to the foregoing question we do not find it necessary to resolve the issue of whether the transfer of blood in the instant case was a sale or a service. But see, Perlmutter v. *335 Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (Ct. App. 1954). If it is otherwise determined that the basic policy considerations which lead to the application of the doctrine of strict liability are here present, that doctrine will be applied regardless of whether such activity by either defendant be characterized as a sale or a service. See Newmark v. Gimbel's Inc., 54 N.J. 585, 593-595 (1969); Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434, 446 (1965); Jackson v. Muhlenberg Hosp., 96 N.J. Super. 314, 324 (Law Div. 1967), rev'd on other grounds, 53 N.J. 138 (1969); Hoffman v. Misericordia Hospital of Philadelphia, 439 Pa. 501, 267 A.2d 867, 870-871 (Sup. Ct. 1970).
Thus, we turn to ascertaining whether those basic policy considerations are here present. Recently, in this State, in our rapidly expanding commercial society, the doctrine of strict liability has been applied to the manufacturers and suppliers of mass-produced products (automobiles, carpeting, homes and motorcycles) who have placed these products in the stream of trade and promoted their purchase by members of the public through the use of large scale advertising programs in and on all existing media of communication. Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434 (1965); Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965); Santor v. A. & M. Karagheusian, Inc., 44 N.J. 52 (1965); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960); Sabloff v. Yamaha Motor Co., Ltd., 113 N.J. Super. 279 (App. Div. 1971), aff'd 59 N.J. 365 (1971). The policy consideration which makes those manufacturers strictly liable in tort for harm caused by defective products is well stated by the court in Santor, supra, as follows:
Such doctrine stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale * * *. [W]hen the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. * * * [S]uch representation must be regarded as implicit in their presence on the market. * * *. The obligation of the manufacturer thus becomes what in justice it ought to be  an enterprise liability. * * *. *336 The purpose of such liability is to insure that the cost of injuries or damage * * *, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. [44 N.J. at 64-65]
See also Henningsen, supra at 384 of 32 N.J.; Schipper, supra at 90 of 44 N.J. and Cintrone, supra at 446 of 45 N.J.
Here the relationship between the hospital and County Blood Bank and decedent was the antithesis of a commercial enterprise. Overlook is a private, nonprofit institution, and County Blood Bank is a charitable, voluntary organization. The former charged $50 a pint for the blood, $25 of which was a service charge for typing, cross-matching and all operations pertaining to its own blood bank; and the remaining $25 was a refundable credit when the blood was replaced in its blood bank on behalf of the patient. The latter, in turn, furnished the pint of blood to the hospital, free of charge, except for testing costs.
As previously noted, the blood was administered upon the orders of decedent's orthopedic specialist. He was of the opinion that the blood was needed during the operation because of decedent's pre-existing medical problems, and postoperatively, by reason of the patient's falling blood pressure and rising pulse rate, to prevent "irreversible shock."
In this case the experts for both sides all agreed that in December 1966 (when the blood was transfused) there was no known scientific or medical test for determining whether blood drawn from a donor contained serum hepatitis virus.[1] Further, Dr. Robert Goodman, a pathologist and medical director of County Blood Bank, testified that as of that date the overall incidence of transfusion hepatitis was "about 1.3 in a hundred cases transfused" and that "the carrier rate, *337 the people who remain with residual virus after infection, is five percent." This testimony was uncontroverted.
Under these circumstances, the following language of the court in Newmark v. Gimbel's, Inc., supra, at 596-597, is most appropriate:
Defendants suggest that there is no doctrinal basis for distinguishing the services rendered by a beauty parlor operator from those rendered by a dentist or a doctor, and that consequently the liability of all three should be tested by the same principles. On the contrary there is a vast difference in the relationships. The beautician is engaged in a commercial enterprise; the dentist and doctor in a profession. The former caters publicly not to a need but to a form of aesthetic convenience or luxury, involving the rendition of non-professional services and the application of products for which a charge is made. The dentist or doctor does not and cannot advertise for patients; the demand for his services stems from a felt necessity of the patient. In response to such a call the doctor, and to a somewhat lesser degree the dentist, exercises his best judgment in diagnosing the patient's ailment or disability, prescribing and sometimes furnishing medicines or other methods of treatment which he believes, and in some measure hopes, will relieve or cure the condition. His performance is not mechanical or routine because each patient requires individual study and formulation of an informed judgment as to the physical or mental disability or condition presented, and the course of treatment needed. Neither medicine nor dentistry is an exact science; there is no implied warranty of cure or relief. There is no representation of infallibility and such professional men should not be held to such a degree of perfection. There is no guaranty that the diagnosis is correct. Such men are not producers or sellers of property in any reasonably acceptable sense of the term. In a primary sense they furnish services in the form of an opinion of the patient's condition based upon their experienced analysis of the objective and subjective complaints, and in the form of recommended and, at times, personally administered medicines and treatment. * * * Practitioners of such callings, licensed by the State to practice after years of study and preparation, must be deemed to have a special and essential role in our society, that of studying our physical and mental ills and ways to alleviate or cure them, and that of applying their knowledge, empirical judgment and skill in an effort to diagnose and then to relieve or to cure the ailment of a particular patient. Thus their paramount function  the essence of their function  ought to be regarded as the furnishing of opinions and services. Their unique status and the rendition of these sui generis services bear such a necessary and intimate relationship to public health and welfare that their obligation ought to be grounded and expressed in a duty to exercise reasonable competence and care toward their patients. In our judgment, the *338 nature of the services, the utility of and the need for them, involving as they do, the health and even survival of many people, are so important to the general welfare as to outweigh in the policy scale any need for the imposition on dentists and doctors of the rules of strict liability in tort. [54 N.J. 596-597]
See Magrine v. Krasnica, 94 N.J. Super. 228 (Cty. Ct. 1967), aff'd sub nom. Magrine v. Spector, 100 N.J. Super. 223 (App. Div. 1968), aff'd 53 N.J. 259 (1969), wherein the doctrine of strict liability was not imposed on a dentist sued by a patient who was injured when a hypodermic needle, being used to administer a local anesthetic, broke off in his jaw. See also, Baptista v. Saint Barnabas Medical Center, 109 N.J. Super. 217 (App. Div. 1970), in which case the court refused to extend the doctrine to a situation where incompatible blood was transfused, resulting in the patient's death.
The only case reported in this State, involving a suit against a hospital and blood bank by a patient who allegedly contracted hepatitis as a result of blood transfusions, is Jackson v. Muhlenberg Hosp., 96 N.J. Super. 314 (Law Div. 1967), rev'd on other grounds, 53 N.J. 138 (1969). Therein, the trial court concluded, among other things, that "[T]he unavoidable presence of hepatitis virus in the blood furnished does not give rise to strict liability for the resultant harm." 96 N.J. Super. at 333 (emphasis added). That conclusion was based in part upon the court's finding that the blood was "a highly useful and desirable product attended with a known but reasonable risk" and it was not "unreasonably dangerous." Id. at 329. The Supreme Court did not reverse on the merits. Rather it said:
* * * The issue [strict liability] is a very important one involving highly significant policy considerations and obviously should not be decided on the wholly inadequate record before us. * * *
* * * We are satisfied that it [partial summary judgment] should now be vacated and that the entire matter should proceed to trial. * * * At the trial, a complete record should be made, including not only detailed testimony as to the nature of the defendants' operations, but also expert testimony as to the availability of any tests to *339 ascertain the presence of viral hepatitis in blood, the respective incidences of hepatitis in blood received from commercial blood banks and other sources, and such other available testimony and materials as may be relevant to any of the questions presented by the parties, including such economic and other factors as may bear on the question of whether the doctrine of implied warranty or strict liability should apply to deliveries and transfusions of blood.
In the instant case such a record has been made. As previously noted, it has been unequivocally established that in 1966 there was no known test available to ascertain the presence of viral hepatitis in blood. (The blood containers used herein had a warning of this fact attached thereto). Likewise, it was not disputed that, at the time, the incidences of this disease being present in the blood were very slight.
As a prerequisite to the application of the doctrine of strict liability a plaintiff must show that the product he alleges was defective was unreasonably dangerous for its intended use. Jakubowski v. Minnesota Mining and Mfg. Co., 42 N.J. 177, 182 (1964); Restatement, Torts 2d, § 402A (1966). Comment (k) to that section of the Restatement discusses "Unavoidably unsafe products," particularly drugs, which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. The comment notes that the use of such drugs is fully justified notwithstanding a medically recognizable risk by reason of the probable serious consequences of the disease or illness for which they are administered. It concludes that such products, properly prepared and accompanied by proper directions and warnings, are not unreasonably dangerous and the seller thereof
* * * is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
Upon the evidence present in this record we conclude that the blood transfused to decedent herein falls within the *340 category of an "unavoidably unsafe product" and thus was not "unreasonably" dangerous. See Prosser, Law of Torts, (4th ed 1971), § 99, at 661-662.
Cunningham v. MacNeal Memorial Hospital, 47 Ill.2d 443, 266 N.E.2d 897 (Sup. Ct. 1970), which held to the contrary, has been widely criticized for its narrow construction of Comment (k). See Notes, 69 Mich. L. Rev. 1172, 1181-1182 (1971); 24 Vand. L. Rev. 645, 653 (1971); 16 Vill. L. Rev. 983, 1002-1003 (1971); 66 N.W.U.L. Rev. 80, 88-90 (1971); 32 Ohio S.L.J. 585, 597-598 (1971). We agree with that criticism.
Community Blood Bank, Inc. v. Russell, 196 So.2d 115 (Fla. Sup. Ct. 1967), relied upon by the court below, is not directly contrary to our determination herein. Rather, it involved a review of a trial court's order dismissing a complaint charging strict liability in a similar situation, and the reversal of that order by an intermediate appellate court. The majority opinion, in affirming but revising the appellate determination, merely held (as did our Supreme Court in Jackson, supra, 53 N.J. 138) that the question of whether there is a recognized method of detecting serum hepatitis in whole blood was prematurely determined by the appeals court, since there were no facts in the record to support that conclusion. The court specifically reserved for decision the question of whether such a conclusion, if it were established by the facts, would constitute a legal defense (196 So.2d at 118). Further, that opinion contains no reference to Comment (k) of the Restatement. Such a reference is found only in a concurring opinion. We find this reference to be subject to the same criticism as was Cunningham, supra. Likewise, Rostocki v. Southwest Florida Blood Bank, Inc., 276 So.2d 475 (Fla. Sup. Ct. 1973), cited by plaintiff, rests principally on the concurring opinion in Community Blood Bank and suffers the same infirmities.[2]
*341 In any event, these three out-of-state cases  Cunningham, Community Blood Bank and Rostocki  are not binding upon us.
Next, we consider the trial court's finding that "loss spreading" or "allocative effect" is an important policy justification for applying strict liability to the hospital and County Blood Bank. The court concluded that if these defendants bear the loss resulting from hepatitis-infected blood, they "will tend to spread the loss amongst all parties, i.e., donors, blood banks, perhaps its patients," increasing their charge for each unit of blood actually used. This theory was evaluated in Magrine v. Krasnica, supra, 94 N.J. Super. at 238-239, the court noting that it "has some weight, but not nearly enough when laid beside other more basic considerations. It plays `only the part of a makeweight argument' * * *." Id. at 239. Further, in the instant case there are no facts in the record supporting the trial court's conclusion.
Based upon all of the above, we conclude that the doctrine of strict liability in tort should not be applied to the hospital or County Blood Bank in the instant case. This conclusion makes it unnecessary to consider appellants' other contentions.[3]
Reversed.
NOTES
[1] In 1972, when this case was tried, the testimony indicated that the most effective test yet devised was the Australian Antigen Test which was then only about 25% effective.
[2] Following the decisions in Cunningham and Community Blood Bank, the legislatures in Illinois, Florida and 39 other states adopted legislation abolishing strict liability in tort in cases involving blood transfusions. 24 Vand. L. Rev. 645, 649-650 (1971); 24 Stan. L. Rev. 439, 474, n. 203 (1972). Rostocki involved a cause of action that arose prior to the passage of the Florida statute.
[3] Since plaintiff does not challenge the dismissal of her complaint against defendant Cavallaro, that portion of the judgment is not disturbed.