189 N.J. Super. 424 (1983)
460 A.2d 203
CAROL ANN FELDMAN, AN INFANT BY HER PARENT AND GUARDIAN AD LITEM HAROLD FELDMAN, PLAINTIFFS-APPELLANTS,
v.
LEDERLE LABORATORIES, A CORPORATION, AND AMERICAN CYANAMID COMPANY, A CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1982.
Decided January 22, 1982.
Reargued Following Remand October 27, 1982.
Decided May 10, 1983.
*425 Before Judges MICHELS, McELROY and J.H. COLEMAN.
James I. Peck IV argued the cause for appellants.
James L. Melhuish argued the cause for respondents (Morgan, Melhuish, Monaghan & Spielvogel, attorneys; Bernard A. Leroe of counsel; Kevin E. Wolff on the brief).
John L. McGoldrick argued the cause for amici curiae (McCarter & English, attorneys for amicus curiae Eli Lilly & Co.; John L. Goldrick of counsel; John F. Brenner, Gordon M. Chapman, Keith E. Lynott and John L. Goldrick on the brief; Porzio, Bromberg & Newman, attorneys for amici curiae Pfizer, Inc. and Warner-Lambert Co.; Anita Hotchkiss and Moira L. Brophy on the brief; Lum, Biunno & Tompkins, attorneys for amicus curiae Abbott Laboratories; Sills, Beck, Cummis, Zuckerman, Radin & Tischman, attorneys for amicus curiae E.R. Squibb & *426 Sons, Inc.; Lamb, Chappell, Hartung, Gallipoli & Coughlin, attorneys for amicus curiae The Upjohn Co.; Goldberg & Carlin, attorneys for amicus curiae Emons Industries, Inc.; Braff, Litvak, Ertag, Wortmann & Harris, attorneys for amicus curiae Burroughs Wellcome Co.).
The opinion of the court was delivered by McELROY, J.A.D.
Defendant Lederle Laboratories is the manufacturer and distributor of a tetracycline antibiotic, Declomycin, a drug first placed on the market in 1959. Plaintiff Carol Feldman was born February 8, 1960. Before she was eight or nine months of age her father, a medical doctor, who also has a degree in pharmacology, treated her with that drug whenever she had an infection. He administered it "eight or ten or twenty ... a good many times" until the close of the year 1963. Suit was brought against defendant on strict liability and negligence grounds because the use of this drug caused discoloration of Carol's teeth. A graying of her teeth was noted by her mother when her child's teeth appeared at about the age of eight months.
Defendant's primary defense was a state-of-the-art approach demonstrating that between 1960 and late 1963 there was no scientific evidence that Declomycin would cause tooth discoloration and such knowledge did not come into existence until after Carol had already ingested enough of the antibiotic to cause her problem. The case was tried on that ground and the jury found in favor of defendant.
On appeal to this court the judgment was affirmed. The Supreme Court granted a petition for certification and summarily remanded the case to this court "for reconsideration in light of Beshada v. Johns-Manville Prod. Corp., 90 N.J. 191 (1982)," decided subsequent to our initial decision in this case. Feldman v. Lederle Laboratories, 91 N.J. 266 (1982). Beshada involved workers suffering from asbestosis and other asbestos-related illnesses due to exposure to asbestos. The Court held that in a *427 case of strict liability, culpability is irrelevant; that knowledge of the dangerous propensity of its product is imputed to a manufacturer, and in a failure to warn case a state-of-the art defense is not permitted. Thus, the Supreme Court on this remand requires that we consider their decision to prohibit such a defense in an "ordinary"[1] products case and to determine whether they intended that ruling to apply to drug product liability, an area of products liability law that in our view has heretofore been treated in this jurisdiction, and in most other jurisdictions, as an exception to the stringent rules applied in other types of products cases.
Although research reveals no case in the State directly dealing with the issue of whether a drug manufacturer is to be held strictly liable for a condition proximately caused by a factor inherent in its product but unknown when the drug was placed on the market and unknown until after the harm had occurred, New Jersey decisions demonstrate that our courts have followed Restatement, Torts 2d (1965), § 402A, comments j and k, as representing the principles applicable to drug and similar products liability cases. Brody v. Overlook Hosp., 127 N.J. Super. 331 (App.Div. 1974), aff'd 66 N.J. 448 (1975) (approval and adoption of comment k of Restatement, Torts 2d, § 402A); Calabrese v. Trenton State College, 162 N.J. Super. 145 (App.Div. 1978) (adoption of comment k), aff'd on other grounds, 82 N.J. 321 (1980); Torsiello v. Whitehall Laboratories, 165 N.J. Super. 311 (App.Div. 1979), certif den. 81 N.J. 50 (1979) (adoption of comment j); Ferrigno v. Eli Lilly & Co., 175 N.J. Super. 551 (Law Div. 1980) (adoption of comment k).
Comment k provides:

Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. *428 An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk. [Emphasis supplied]
In the same manner, comment j, which deals in part with over-the-counter drug products (Torsiello, supra, 165 N.J. Super. at 319-20), requires a warning to the consumer "if [the seller] has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger."
Comment k clearly does not employ strict liability principles as to prescription drug manufacturers. Their liability is gauged by what are essentially negligence principles, including the state-of-the-art concept, which are employed in recognition of the special benefits to society from new drugs and vaccines and an awareness that despite stringent federal regulation and independent testing by drug manufacturers, the "medically recognizable risk" of the unknown always exists, "but such experience as there is justifies the marketing and use of the drug" because the new or experimental drug does serve useful and intended purposes. The underlying reason for special exemption of prescription drugs is the public policy concern that imposition of the strict liability or, perhaps more accurately stated, the almost absolute liability, principle of the Beshada approach would chill if not smother the research, development, *429 production and marketing of new or experimental drugs necessary to alleviate or cure the ills to which we are all subject.
Beshada is a clear expression of another public policy, i.e., "that the manufacturers and distributors of defective products can best allocate the costs of the injuries resulting from those products." 90 N.J. at 205. Thus, Beshada, in the context of an ordinary products case, conceives no problem in spreading the risk of injury from a product, even one where the defect was undiscoverable, because "[b]y imposing on manufacturers the costs of failure to discover hazards, we create an incentive for them to invest more actively in safety research." Id. at 207. The problem, however, is not so readily addressed and resolved in cases involving a prescription drug which, as does Declomycin, serves a human need. We observe that although imposition of Beshada liability may indeed create incentive in ordinary products cases "to invest more actively in safety research," in new drug situations the imposition of strict liability can have an effect which does not serve the general public welfare. "It would cause drug companies to hesitate and prolong time before precious, beneficial and long-awaited drugs were put on the market." Leibowitz v. Ortho Pharmaceutical Corp., 224 Pa.Super. 418, 307 A.2d 449, 458 (Super.Ct. 1973). Dean Prosser expressed the justification for the exception to the general rule as to such products in the following manner:
The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them. Thus far the courts have tended to hold the manufacturer to a high standard of care in preparing and testing drugs of unknown potentiality and in giving warning; but in the absence of evidence that this standard has not been met, they have refused to hold the maker liable for the unforeseeable harm. [Prosser, Torts (4 ed. 1971), § 99, at 661; emphasis supplied]
In Payton v. Abbott Labs, 386 Mass. 540, 570, 437 N.E.2d 171, 189 (Sup.Jud.Ct. 1982), it was observed that "[p]ublic policy favors the development and marketing of new and more efficacious *430 drugs. The Restatement (Second) of Torts recognizes this policy by rejecting strict liability in favor of negligence for drug related injuries. Restatement (Second) of Torts § 402A, comment k (1965)." The Massachusetts court in a footnote repeated a statement Assistant Surgeon General David Sencer made at Polio Immunization Program hearings in 1976 before the Sub-committee on Health of the United States Senate. Dr. Sencer warned that "[m]anufacturer liability for vaccine-associated disability, regularly assigned by courts, threatens a predictable vaccine supply  especially of oral polio vaccine  and diminishes the chances of significant independent manufacturer-sponsored research and development of new biologics." Id. at 190, n. 17.
Leibowitz v. Ortho, supra, involved a claim of thrombophlebitis from ingestion of contraceptive pills and the adequacy of the package insert warnings in light of later discoveries of causal relationship. In affirming the trial court's refusal to consider this evidence the appeals court observed
In no reported case, has a court imposed liability on a prescription drug manufacturer on the basis of facts or discoveries made subsequent to the date a particular cause of action accrued. To do so would be to fatally choke the industry in its marketing and development procedures. A drug manufacturer would virtually become an insurer against all possible consequences, which at some future date prove to be `caused' by the use of its product. It would cause drug companies to hesitate and prolong the time before precious, beneficial, and long-awaited drugs were put on the market.
Because of the desirability of permitting drugs of proven value to be marketed despite known or suspected risks in said drugs, courts have uniformly held that `a drug, properly tested, labeled with appropriate warnings, approved by the Food and Drug Administration, and marketed properly under federal regulation, is, as a matter of law, a reasonably safe product. Accordingly, a person claiming to have suffered adverse effects from using such a drug, unless he can prove an impurity or an inadequacy in labeling, may not recover against the seller ...' Lewis v. Baker, 243 Or. 317, 413 P.2d 400, 404 (1966); see also, Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971). [307 A.2d at 458]
In Gaston v. Hunter, 121 Ariz. 33, 46, 588 P.2d 326, 339 (Ct.App. 1978), the court, referring to comment k, stated that it "expresses a policy judgment that the availability of certain types of products is so important to society that the suppliers of these products should not be subject to strict liability for resulting injuries."
*431 In Woodill v. Parke Davis & Co., 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (Sup.Ct. 1980), the court observed:
This court is acutely aware of the social desirability of encouraging the research and development of beneficial drugs. We are equally aware that risks, often grave, may accompany the introduction of these drugs into the marketplace. We simply think, however, in accordance with comments j and k of section 402A of the Restatement (Second) of Torts, that where liability is framed by the manufacturer's duty to warn adequately of dangers which may arise from the use of a drug, that liability should be based on there being some manner in which to know of the danger. Otherwise the warning itself, which is the focus of the liability, would be a meaningless exercise. [37 Ill.Dec. 304, 402 N.E.2d at 199-200]
The concept that, as a matter of policy, public health benefits must be considered in new and experimental prescription drug cases and that these cases call for application of negligence-like principles has received wide acceptance. In "strict liability"-prescription drug cases most jurisdictions, whether they address the underlying public policy purpose or not, adhere to the reasoning employed in comment k as a recognized exception to the black letter rule of Restatement, Torts 2d, § 402A, or employ similar rationale without direct reference to comment k. The following are examples. Arizona, Gaston v. Hunter, supra, (experimental drug; comment k applied. The court considered the risk that a beneficial drug might be withheld from mankind too long as an unacceptable result of the imposition of true strict liability. 121 Ariz. at 48-49, 588 P.2d at 341-342); California, Christofferson v. Kaiser Foundation Hospitals, 15 Cal. App.3d 75, 92 Cal. Rptr. 825 (D.Ct.App. 1971) (treatment of Lupus erythematosus with Aralen alleged to have caused severe and irreversible limitation of vision, the risk allegedly being unknown at time of marketing and use. Comment k utilized and normal rule of strict liability rejected); Connecticut, Tomer v. American Home Products Corp., 170 Conn. 681, 368 A.2d 35 (Sup.Ct.Err. 1976) (use of anesthetic agent Halothane, hypersensitive reaction caused liver damage from which patient died. State-of-the-art defense permitted without direct reference to comment k); Basko v. Sterling Drug, Inc., 416 F.2d 417 (2 Cir.1969) (Connecticut law applied; comment k cited. Duty to *432 warn held to apply when risk of drug became apparent. No duty to warn of unknown or unforeseeable side effects of drug. The court recognized the policy considerations. Id. at 425-426); Illinois, Woodill v. Parke Davis & Co., supra (comment k applied; public policy reason stated. It should be noted that Illinois rejects the Beshada approach and requires objective foreseeability in applying strict liability to all products cases. 402 N.E.2d at 197-199); Indiana, Ortho Pharmaceutical Corp. v. Chapman, 388 N.E.2d 541 (Ind. Ct. App. 1979) (comment k applied; public policy reasons recognized in case involving thrombophlebitis attendant to oral contraceptive use); Ohio, Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831 (1981) (comment k employed in contraceptive drug case, question being the adequacy of the warning. Rule adopted that warning is adequate if "it reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist...." 67 Ohio St.2d at 196-198, 423 N.E.2d at 836-837); Pennsylvania, Leibowitz v. Ortho Pharmaceutical Corp., supra, (comment k not referred to but public policy invoked. Court held that duty to warn involves only those risks known when cause of action accrued); Texas, Schering Corp. v. Giesecke, 589 S.W.2d 516, 518 (Tex.Civ.App. 1979, writ ref'd n.r.e.) (No reference to comment k or to policy rationale. Duty to warn required where manufacturer of drug "knew or should have known of a potential harm to a user because of the nature of its product").
Plaintiffs contend that Beshada dealt a death blow to state-of-the-art as a legal principle in strict liability cases and "admits of no exceptions to its comprehensive holding." Plaintiffs view Beshada and Michalko v. Cooke Color & Chemical Corp., 91 N.J. 386 (1982), which reiterates, in an ordinary strict liability situation, that knowledge of a product's dangerous characteristics is imputed to a defendant (id. at 394-395), as squarely deciding all "strict liability" cases, including prescription drug cases, thus requiring application of the Beshada rule here. We do not agree.
*433 Neither case purports to deal with drug products or related cases. The Supreme Court has treated such matters as calling for application of comment k principles rather than the ordinary strict liability rules and we conceive no basis in Beshada for this court to hold otherwise in a prescription drug case. Brody v. Overlook Hosp., supra.
Brody involved a claim of serum hepatitis from a blood transfusion. Experts in the case agreed that when the blood was given there was no known scientific or medical test for determining whether the blood contained the hepatitis virus. The blood containers warned of the inability to test for the virus. The case was regarded by this court as one where the product was "unavoidably unsafe" and one to which the principles of comment k applied. 127 N.J. Super. at 339-340. We held, under comment k principles, the product was not "unreasonably dangerous" and that true strict liability principles were not applicable. Ibid. Equally, this court held that the trial court's application of strict liability to the case was not justifiable because the policy considerations calling for application of that doctrine were not present in a case involving a medical product beneficial to humans. We rejected the risk-spreading approach as not a weighty consideration in the circumstances of a non-commercial venture. The Supreme Court affirmed, noting that the risk was undiscoverable at the time of use of the blood and that we had held that the hospital and blood bank were under a duty to exercise due care but were not accountable under the theory of strict liability in tort. The court held that "[s]ound policy considerations dictated that result" and affirmed. Of equal importance, however, is the explicit approval by the Supreme Court of the use of comment k. Thus, it held:
The Appellate Division, in the context of blood transfusions and drug-type situations (127 N.J. Super. at 339), properly placed reliance on § 402A of the Restatement Torts 2d (1966), but for present purposes we need not consider whether its requirement of a showing that the product was `unreasonably dangerous' is to be deemed generally applicable in other contexts. Cf. Glass v. Ford Motor Co., 123 N.J. Super. 599 (Law Div. 1973); Cronin v. J.B.E. Olson Corporation, 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972); Note, 5 Seton Hall L.Rev. 152 (1973). [66 N.J. at 451; emphasis supplied]
*434 The foregoing evinces not only express approval of the use of negligence principles in blood transfusions and drug-type situations but clearly implies that "in other contexts," i.e., other products cases, the requirement that the product be "unreasonably dangerous," a negligence concept, might not be applicable. That 1975 reservation, as to other products cases, was resolved in Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 174-176 (1979), where the Supreme Court held that in the use of the strict liability doctrine in ordinary products cases a definition of a product defect as "an unreasonably dangerous condition does not advance an understanding of the concept [of strict liability] and will not assist a jury's comprehension of the issues which it must resolve." Id. at 176. It is to be noted that notwithstanding this holding as to product cases in general, no attempt was made to diminish the use of the "unreasonably dangerous" negligence principle as to drug-type cases. The court was not unaware of Brody and its holding; it cited Brody as illustrating that the question of whether strict liability should be applied "is ultimately one of public policy ... upon a consideration of all relevant factors to decide what is fair and just." Id. at 172.
In areas involving public health there are weighty policy considerations on both sides of any question as to whether strict liability should be applied. Granted, drug production is commercial enterprise but it has a unique and intimate relationship to the health and even survival of many people. Cf. Newmark v. Gimbel's, Inc., 54 N.J. 585, 597 (1969). Admittedly, Beshada speaks in broad terms, but absent a direct expression that prescription drug-type cases are no longer to be separately treated we do not, nor can we, regard Beshada as effecting a policy change of such dimension. "Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court. The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature." Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 35 (App. Div. 1981).
*435 The foregoing reservation is particularly appropriate where, as we have already demonstrated, there is presented a conflict between two judicial declarations of public policy. In such circumstances any court must be moved to exercise extreme caution. A policy designed to encourage the research, development and marketing of drugs and biologics beneficial to humankind has sound purpose and may outweigh the policy of spreading the risk of loss by imposition of liability. Dean Prosser, the reporter and author of § 402A, comment k, and an objective observer, has recognized the societal need for the comment k approach and the inherent prospect of deterrence to research and development of generally beneficial drugs in a contrary rule. Prosser, Torts (4 ed. 1971), § 99 at 661. Judicial adoption of a true strict liability rule to prescription drugs obviously will have broad national effect upon the wide spectrum of drugs now on the market and those developed in the future. Drug companies have been known to do research and testing independent of that required by federal regulations as to new and experimental drugs. If they are to be held strictly liable for any side effects of a beneficial drug, discoverable or not, that may encourage prolonged independent testing but may equally prolong suffering by denying the needed cure or delaying its use. The problems involved in a major declaration of public policy may, in our scheme of government, be more fairly and properly addressed by federal legislative committee hearings leading to more stringent drug regulations and perhaps a scheme of compensation for those injured by side effects of otherwise beneficial drugs and related products.
It is difficult to assess without specific examples (hardly available in a single case) where the greater need rests. The record here presented certainly gives no proper base to address the conflict in public policy views. The concern that because of fear of liability and resulting enormous monetary loss drug manufacturers may not be willing to undertake production of vitally needed medical drugs or vaccines may well be soundly based. We take notice that during the period of the swine flu *436 epidemic in 1976 Senate subcommittee hearings revealed the valid concern of drug manufacturers that production of the needed vaccine would subject them to enormous risk of liability from mass innoculation. In order to insure sufficient production of the vaccine the Federal Government passed legislation relieving manufacturers of liability for unknown side effects of otherwise properly made vaccines and the government assumed liability for such risks. National Swine Flu Immunization Program of 1976, Pub.L. No. 94-380, 1976 U.S.Code Cong. & Ad. News (90 Stat. 1113). After the program was implemented a relationship between the vaccine and Guillain Barre syndrome was discovered, resulting in a large amount of claims and suits against the government.
The desire to solve the problem of injury from "unknown" but later discovered effects of beneficial and needed drugs is undeniably a worthwhile concern but will the solution of risk-spreading by strict liability principles cause harm to the greater public good? Will insuring costs place the cost of research development and eventual marketing of new drugs beyond that which manufacturers, especially smaller manufacturers, are willing to risk? Will insurers be willing to write such risks, and at what cost? Is it possible that the resulting cost of drug production will place the price of necessary drugs outside the reach of those who most need them, and what would be the effect in the area of the so-called orphan drugs, designed to treat uncommon diseases affecting only a small part of the general population? These questions and many other aspects of the problem are posed by this case and perhaps can only be fairly resolved by federal legislative and investigative process. We are certain we have merely touched the surface of the economic and societal questions posed by the issue. We do so to illustrate that this court, or perhaps any court, is ill equipped to properly and fairly address the need, if there be one, for drastic change in what we hold is the present law as to "strict liability" as it is presently applied in this and in most other jurisdictions to prescription drug products.
*437 Upon reconsideration we affirm the jury verdict entered at the trial of this matter and the judgment resulting therefrom.
NOTES
[1] We use the term "ordinary" because, as will be demonstrated, infra, the principles of "strict liability" as applied to drugs contain elements of negligence law.